**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00005-CV**
_____

**IN THE INTEREST OF J.B.C. AKA J.B.S.**

_____

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 18-10-13598-CV**

_____

**MEMORANDUM OPINION**

Mother appeals from an order terminating her parental rights to her three-year-old child, Jordan.[1] The trial court found, by clear and convincing evidence, that statutory grounds exist for terminating Mother's parental rights and that terminating her parental rights would be in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). In three appellate issues, Mother challenges the

---

[1] To protect the identity of the minor, we use pseudonym *Jordan* for the child J.B.S., and for his mother. *See* Tex. R. App. P. 9.8(b)(2). Father signed an Affidavit voluntarily relinquishing his parental rights to Jordan, and for that reason he is not a party to this appeal.

sufficiency of the evidence supporting the trial court's conclusion to terminate her parental rights to Jordan under subsections D and E and its finding that terminating Mother's rights was in Jordan's best interest. We affirm.

## Background

The Department of Family and Protective Services (the Department) intervened in a pending Suit Affecting Parent-Child Relationship after receiving multiple complaints regarding Mother's and Father's neglectful supervision of Jordan. Jordan was in their possession. According to the Affidavit in Support of Removal filed by the Department with its petition, beginning in 2019, there were complaints of domestic violence between Mother and Father, which occurred in Jordan's presence. According to the Department's petition, Mother also alleged that Father had sexually assaulted her daughter in the presence of Jordan. As early as July 2019, the Department's investigation revealed concerns about Mother's mental health and her possible misuse of prescription medications, including Ambien, given the responsibility she had in caring for Jordan. In September 2020, the Department received a report that Mother and Father were involved in a possible incident that involved domestic violence. When an investigator for the Department went to Mother's and Father's home, she found Mother had a black eye and bruises on her arm. Jordan was present when the altercation occurred. When investigators followed up later that month at the parent's home , Mother failed to answer the door or her

2

phone. However, Mother opened the door when the police arrived. But at that point, Mother appeared to be under the influence, used the frame of the door for support, and clenched her teeth while talking with the investigators. That same month, Mother dropped off an older child that is not the subject of this proceeding at school before 6:00 a.m. and left the child at school even though no adults were there to supervise her. While unsupervised, the older child, who was eight, left the school's property and was later discovered by one of the school's bus drivers at a nearby apartment complex outside and in the pouring rain. The Department affidavit of removal also refers to an incident where the Department was called and the investigator reported overhearing Mother and Grandmother having a verbal altercation in which Mother accused Grandmother over throwing bleach onto her. The investigator who signed the affidavit also reported hearing Mother threatening to harm herself during the verbal altercation Mother had with the Grandmother.

The trial court granted the Department's petition, allowing the Department to take Jordan into custody and to place her in foster care during the pendency of the suit.

**Courtoni Allen's Testimony**

At trial, Courtoni Allen testified that she is a conservatorship caseworker for the Department of Family and Protective Services (the Department), currently assigned to this case. Mother has two children, Jordan, who was age three at time of

3

trial, and a daughter, who is eight. According to Allen, Mother's children were removed for several reasons, including that Mother dropped her eight-year old child off at school before school personnel were there, Jordan fell in a swimming pool when he was at Father's home, and Mother and Father allowed incidents of domestic violence to occur when their children were present. Mother was given a family service plan that required her to take parenting classes, obtain psychological evaluations, participate in random drug testing, and attend domestic violence classes, along with several other requirements. A copy of the family service plan was admitted into evidence. Allen stated that generally Mother completed the classes, but she did not testify whether Mother had complied with the recommendations Mother was given in those classes. Allen observed visitations between Mother and Jordan, and she stated she had concern that Mother was under the influence during at least two of these visits. Specifically, in one of the visits, Allen described Mother's behavior as "spacey" and her physical activity as "slow." Allen also noted, "[Mother's] questions were repetitive even after being asked to not bring up certain subjects. She would repeat the same question over to her children." Allen explained that Mother's visitations with her children were eventually terminated for several reasons, which included asking the children questions that were not age appropriate, discussing her daughter's sexual abuse, where her daughter was placed after removal, and telling her daughter that her biological father was not her father.

According to Allen, she could not recall whether Mother asked Jordan inappropriate questions. According to Allen, the demeanor Mother presented when she testified in the trial was "a little bit different[]" than the behavior she'd witnessed when Mother exercised her rights of visitation. Allen explained that in her experience, Mother appeared "shaky" and not "like herself when we talk." Allen also expressed that she has an ongoing concern that Mother is continuing to abuse prescription drugs. When asked about Mother's living arrangements, Allen testified that Mother lives in a "big" house, yet Mother has provided the Department with no proof of her income.[2]

Allen also addressed Jordan's placement, her concerns of Jordan's safety if returned to Mother's care, and the Department's future plans. According to Allen, Jordan was in foster placement at time of trial and has been in that placement since January 2021. She explained that Jordan is undergoing physical therapy. Turning to her concerns about Jordan if returned to Mother, Allen said:

> My concern is for his physical safety when she's under the influence of her prescription medication. I don't think that she would be protective. That's the biggest concern is – and as well as arguing and violence and [Jordan] is a vulnerable age.

She testified that Jordan is currently in an adoptive placement and it is the Department's plan to keep Jordan in that placement. She acknowledged that she has not personally witnessed Mother being argumentative or violent. Even so, Allen

---

[2] The record contains evidence of Mother's income that was filed by her in the underlying SAPCR suit, which records are available to the Department.

stated that in her opinion, Jordan was placed in a position of emotional or physical danger when present in a home where violence occurred that involved Mother, Father, and Grandmother. Allen testified that in her opinion, Mother has mental health issues that past experience shows prevents her from providing Jordan with a safe and stable home.

**Nancy McCulloch's Testimony**

Nancy McCulloch is the guardian ad litem the trial court appointed in the case in November 2020. According to McCulloch, she visited Jordan "[o]nce a month, sometimes twice a month." She described Jordan as a happy and active child, explaining he does not have any special needs and has benefitted from physical therapy. McCulloch testified she observed one visit between Jordan and Mother. Based on that visit, McCulloch stated she had no concerns with Mother's interactions with Jordan. That said, McCulloch explained that she has spoken to Mother on occasions other than when she observed Mother and Jordan in the visitation, and based on what Mother told her in those conversations McCulloch testified, "[Mother] just made several alarming statements."[3] According to McCulloch, she has conversations with Mother "every other month or so[,]" and

---

[3] McCulloch stated that Mother told her Mother had "diplomatic immunity in every country and if I felt [Daughter's Father] was a terrorist, [she] could shoot him in broad daylight." She also stated that her daughter will "die in his hands. He will rape her. I will stalk him. I will have the sheriff on his doorstep."

sometimes these go well, meaning Mother is alert and cooperative. But on other occasions, McCulloch said, Mother's voice is slurred and she appears to be under the influence. McCulloch agreed that Mother "spoke quite often" about domestic violence between Mother and Father and agreed that the Jordan could have heard or witnessed these instances of domestic violence. McCulloch expressed her opinion that if Jordan were to be returned to Mother, she would be concerned for Jordan's safety given her concerns about Mother's mental stability and abuse of prescription drugs. McCulloch recommended that Jordan's best interest would be served if a person unrelated to Mother and Father were to adopt Jordan.

**Susan Truscott's Testimony**

Susan Truscott is the CASA supervisor assigned to this case. She testified she observed one visit between Mother and Jordan and that based on that visit, she did not notice anything raising an issue of safety. Yet Truscott also testified that when she visited Mother while assigned to the case, Mother made statements that the trial court, as the factfinder, could have relied on as additional support for its finding that Mother endangered Jordan or left him with someone who endangered his physical or emotional well-being. According to Truscott, Mother told her in one of her visits

> as I'm walking into the house, she was telling me, "He's a terrorist."
> And I was asking who she was referring to and she mentioned [Father].
> And then when we were in the house, both [Mother] and [Grandmother]
> were talking but [Mother] was saying about [Father] being involved in
> an honor killing and that's why he moves around a lot. She mentioned
> that CPS and the judge are corrupt, and they take money for children in

the system…. She said she didn't know why [Jordan] was taken into care. There was no reason for that. And that [her daughter] skipped out on school so, like, left school and that's why [her daughter] was taken.
. . .
[Grandmother] added that [Father] was a pedophile and also he moved money around illegally …[.] He's definitely killed people if his DNA … if they took his DNA, they'd see that he'd murdered people.

When asked Mother's plan for Jordan if he was placed back in her custody, Truscott stated that her impression was that Jordan would live in a big house on Mother's property with Grandmother and that Mother would live in a "smaller house[.]" Truscott stated that when she visited Mother's home, she observed medication bottles in the open, that Mother told her that it was her medicine and that she keeps it "safe in her bag." Truscott stated she saw prescription medicine on kitchen shelving, but the medicine was removed after she inspected Mother's bathroom. When she asked Mother about the medicine, she claimed it was over the counter medicine. She also observed loose pills that she told Mother to properly dispose.

**Mother's Testimony**

Mother testified that she has two children, her older daughter and Jordan. She stated that she is currently engaged. According to Mother, she and Father never married, explaining they only dated but never lived together. Mother testified that when she and Father were dating, Father "mentally abused me and he physically abused me." During one of Mother's birthday parties, for instance, Mother said that Father assaulted her and Jordan. Mother testified she worked as a substitute teacher

8

until her high-risk pregnancy with Jordan forced her to go on bedrest. According to Mother, she is currently prescribed a muscle relaxer and sleep medication. Mother stated she was taking two different medications at trial but claimed they had no "side effects." Later, Mother admitted she takes a "gummy anxiety medicine," and stated the medication affected her ability to think, talk, and verbalize during the trial. She also accused Father of giving her "something from India[,]…I think that he did that to knock me out in order to get my children." Mother admitted she has mental health problems, explaining she developed anxiety after initiating her relationship with Father. According to Mother, she has been diagnosed with "post traumatic syndrome" and "anxiety," and stated she takes medicine "every single day." Emails, which Mother denied sending to the Department, were admitted into evidence in the trial. The first of these two emails states:

> First of all [name redacted] has said to me and to you me. [Caseworker] that she will not under in court order put my son [Jordan] in danger. She believes and I know that on multiple times [Jordan] has been abused by [Father]. [Father] is NOT [Jordan's] Father! He knows this! I have asked from day one and begged him to get a DNA test. He has refused and signed that he was his dad. My son is 100% white in case you are blind! Which no one is and certainly not me. It is impossible for him to be the dad. I believe that something has happened to my son where his life was in danger with [Father]. My son[']s life has never at any time been in danger with me. I have been an excellent mother to my Son mr. [Jordan] and please remember to call my son with respect as Mr. [Jordan] and please remember to call my son with respect as to Mr. (Jacob) after his late uncle…of Five Star Mentals Inc in Houston TX and …. the investor of Eagle Lake Tx and …. and owner of multiple stores in [S]ulfur [S]prings[,] Tx. My son [Jordan] is loved and very safe in my care has always been. As of yesterday I have been informed

9

he has separation anxiety and is rolling rocking and head bagging because he misses me so very much. My son and I FaceTime every day! He is a huge mom[']s boy for a reason. My son was sexually assaulted by [Father] as was my daughter which CPS has medical documentation of this and has recorded it! But yet you say [Father] who is not and has not been in my son[']s life is able to visit him. No member of the [Mother's] family will ever allow him to hurt [Jordan]! Or any child any more! (sic) The cycle of abuse stops with My SON ! ! ! ! The entermitten Explocivr Disorder (sic) stops Here! I will not allow my son to grow up and beat on his wife and children! All because [Father] does and his dad and grandfather did! My son is going to be normal and mentally healthy. Because it is what I want for him among other things. If CPS refuses to protect my babies then a real moral god fearing family will! We will always put children first and that has been since the beginning of our family back in 1475! It's sad that you [caseworker] know what [Father] has done and are saying as a CPS employee that you will indager (sic) my son by allowing [Father] to visit. Who raised you who was your mother. I am so very sorry that she taught you that abuse is okay. She must of been abused as well. If you have child it would be best if you put them into a safe place until Brandy Powell can explain to you that it is not okay for you to sexually abuse or in anyway abuse your children. A child should be with there (sic) mother. All doctors know this! The best interest of my son is for me to stand on my beliefs! Which I will. As a American I do I issues with a terrist (sic) being in my country he needs to go home. He has done to much harm to my country. Please I'm begging as a mother and someone who puts children fist please think about what harm this man has done to the elderly to children and to my family and country! How can you at CPS call yourself Americans how can you say you care about children but send a child to his abuser. I have [Father] on recordings abusing me and my child I have video and photos. I have proof but so far [Father] walks free. This is going to end up looking very bad for Texas and it makes me know that the end really is here and yes hells gates will over flow. I and my children know where we stand on the right side! [Caseworker] you are standing on the wrong side please stand for your country for children and for women. Have you ever felt the pain of being beaten by a man so bad that you can barely move or have the emotional baggage that comes along with being permanently damaged by a man or being raped by a man or threaten constantly. I have ! I have had my lip busted so many times that there is a knot of dead tissue in it. My nose is not

10

ever going to look right I have had to many black eyes to count. My children have been sexually abused by [Father] and mentally and physically. How can you say he can visit. I will say this I will kill I will die I will fight I will stand for my kids. I have done everything for vomit on me all nighters (sic) spit up breast feeding changing diapers therapy doctor[']s appointments ARD meetings speech everything for the welfare of my kids. One man destroyed my life. Now I am being abused and my children are by CPS. So I'm being raped and my children are all over again. Thanks [caseworker] for being the typical man. You and [Father] should have some beers go rape some kids and beat up on woman and burn the American flag and brag about it. Why don't all men just admit to being over grown monkeys and live in Africa where y'all belong. Leave my kids alone [Father] I will kill for them. And by the way I'm still waiting on bombs to go off you promised to blow up and destroy my country we are waiting said you have so much hatred for America and you said we would be bombed by your group. I'm waiting for India to attack so is the United States Navy! Please I'm begging act on what you so strongly believe act for your country so I can act on what I believe! This will end in a body count as everyone knows it will. [name redacted] will do what she has to to raise my kids after me and many terrist (sic) are dead! After [Father] kills me maybe Montgomery County will take abuse more seriously that they do know. Why should women have to die to get a point across? Why does it always end in blood shed? Why does he walk free? My daughter wants to know why he is not in prison? She has asked why the police have not arrested him many times? I tell her the truth men stick together as tapestry child abusers and women beaters they always will! Which is why I know my baby girl will always see men as they truly are. She knows men are evil!

At first, Mother denied sending the emails, suggesting that Father had hacked into her computer. But then Mother testified she sent the emails after charging Father with assault and while her "emotions were running high[.]"[4]

---

[4] Mother sent two emails to the Department, and both were admitted at trial. The second email contained similar allegations and statements.

During the trial, Mother described the incident she believed led to the Department's intervention and decision to remove Jordan from her home.

[The Department's Attorney]: Why do you believe CPS has become involved in this case?

[Mother]: They [be]came involved in this case because my mom had an emergency. She had a procedure and I never seen my momma that sick and I had to take my daughter to school a little bit early and I put a note in her backpack and told her to go where the speech -- there's a couch and I told her to go and be with the employee.

[The Department's Attorney]: You dropped her off at school before school started, right?

[Mother]: Yes, ma'am. And I've never done that.

[The Department's Attorney]: And it was around 6 a.m.?

[Mother]: No.

[The Department's Attorney]; What time?

[Mother]: It was more like 6:40.
[The Department's Attorney]: And was it dark?

[Mother]: It was a little bit dark.

[The Department's Attorney]: Was anyone at the school?

[Mother]: Yes.

[The Department's Attorney]: And was it raining?

[Mother]: Well, that's why I told her she had to go in.

Mother elaborated that Grandmother was scheduled for a medical procedure that morning and Grandmother was very ill from what the doctors "made her

12

take." When Mother dropped her older child off at the school, she said "a janitor" was at the school. Mother later found out that older child left the school's property and wandered off.

Mother also described a physical altercation between her and Grandmother that resulted in her eight-year-old daughter calling a friend. Mother's friend then filed a report with the Department.

> There -- this is hard to explain but my mom has a phobia to storms and there was a hurricane coming in and for like three days, she washes the toilets. She fills up the bathtub. It was not to hit us but she handed me the -- it was toilet Lysol and I didn't know what it had in it 'cause I'm allergic and, you know, it popped off. It was just an accident. It popped off, but I freaked out because I didn't know what it had in it. It's blue. But she does have -- I mean, she's always been like that with storms. She had a bad incident as a child.

Mother described her behavior as "very dramatic." While the report resulted in the Department doing a "welfare check" at the home, Mother testified that when the Department checked the home "[w]e were fine."

Mother agreed that because she has medical issues, Grandmother lives with her and that she has lived in the home with Grandmother for twenty years. According to Mother, the home is three bedrooms, two and a half baths, and has approximately 3500 square feet of space. Mother testified the home is on 20 acres and is worth "over $2 million." Grandmother lives in a house that Mother described as "tiny" and on the same 20-acre tract. Mother testified that upon marrying her current fiancé, she plans to move to another town in Montgomery County. According

13

to Mother, she is "considered an adult child," receives $1000 a month, benefits form Medicaid, and approximately $1000 a month from an estate.

When asked about her service plan, Mother stated that she has completed "all my services[]" under her service plan. This includes parenting classes and "extensive therapy" with at least three different counselors.

Mother testified she is asking for "custody of my son and sole conservatorship." Mother believes that Jordan wants to come and live with her and describes herself as "protective" of Jordan. According to Mother, she has a strong support system, which includes her fiancé, her mother, and her friends. Mother plans to make arrangements where Jordan can obtain physical and speech therapy. Mother conceded she was unaware Jordan needed physical therapy but it was something Jordan's foster parent had arranged, and she indicated that "as far as [she's] concerned, he's fine." Mother concluded by stating she feels she is capable of raising Jordon on her own and that her "nickname[] [is] supermom."

**Grandmother's Testimony**

Grandmother testified that Mother is her daughter. Grandmother agreed that Mother has some mental health issues. Grandmother also testified that Mother "was beat extremely bad[,]" on several different dates by Father. According to Grandmother, Father on occasion has also assaulted her, an assault that occurred in Jordan's presence. Grandmother testified that Jordan was present when Father

14

assaulted Mother too. According to Grandmother, Mother suffered a brain injury when she was assaulted by Father. After that assault, Grandmother explained, Mother was hospitalized and her behavior changed. According to Grandmother:

> [Mother] used to be so levelheaded. I mean, levelheaded and she would calm me down if I got upset. But since that happened and her anxiety -- you know, it's not good.

Grandmother testified that after Mother pressed charges against Father, Father was prevented from going "near us or the children or anything." Mother also had the entire family go to a psychiatrist after the abuse. Grandmother stated that beginning in April 2019, Father called the Department on them constantly.

When asked why Mother appeared in court to have problems talking and walking, Grandmother stated that Mother has anxiety and gets nervous. Grandmother stated that on the day Mother dropped her daughter off early at school unsupervised, Grandmother was scheduled for a planned procedure, had an allergic reaction to medicine, and got sick. Grandmother described Mother as an "excellent" mother, and expressed her opinion that Jordon should not be removed from Mother's home. Grandmother said:

> Maybe I see it from my view. Everybody says -- everybody -- that these children are the most lovable children they've ever met in their life; and in order to be the most lovable children, I sugar them to death and [Mother] does, too. They have more love than any children I've ever seen in my life and that shows because they are so lovable. And, yes, [Mother] has some problems but she's working on it and that doesn't mean that the children should hurt and be hurt for the rest of their life. ….We are good people.

15

Grandmother disagreed that she lived in a tiny house, explaining the house she lives in is "a 3200 square foot brick home next door with a four-car garage." Grandmother explained she never told the Department about the home she lived in because the Department "didn't ask."

**Robert Ward's Testimony**

Robert Ward testified on behalf of Mother and stated that he is an assistant pastor, has known Mother for ten years, and is Mother's fiancé. Ward testified that he and Mother were planning to live in his home in Splendora after getting married. He acknowledged that Mother has mental health issues, but he believes she is a good mother. He has not seen Mother with Jordan or her eight-year-old daughter, but testified he knew Mother works as an assistant Sunday school teacher and that he trusts her to watch his six grandchildren.

**Terri Adams' Testimony**

Terri Adams testified that she has known Mother since she was a toddler. She stated that Mother suffers from anxiety and displays that anxiety by being "[r]eal nervous, edgy." She stated that she has never seen Mother take Ambien, drink alcohol, or use narcotics. She described Mother as a good mother protective of her children, and the children as always cared for.

**Deborah Hilton's Testimony**

Deborah Hilton testified she has known Mother for a few years through their church. She stated that she has witnessed Mother interacting with her children before they were removed by the Department. She described Mother as a "fantastic" mother. She stated that the children were well fed and well-mannered. Hilton described Mother as protective of her children.

**Standard of Review**

In a case terminating the relationship between a parent and a child, the Department must prove that at least one of the statutory grounds for terminating the relationship exists and prove that terminating the relationship is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1)(A)-(U), (2). Both the evidence presented to establish the grounds for termination and the best-interest finding must be proven by clear and convincing evidence. *Id*. § 161.001(b); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Clear and convincing evidence is the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

When, as here, the parent appeals complaining that there is not enough evidence to support the trial court's conduct endangerment or its condition endangerment findings, we review the evidence admitted during the trial and determine whether it allowed the trial court, acting as a reasonable factfinder, to form

17

a firm belief or conviction the parent endangered the child. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (holding that in an appeal, the reviewing court must review the parent's issues that complain about the conduct endangerment and condition endangerment findings based on the parent's right to due process). In our review, we examine "the evidence in the light most favorable to the [trial court's] finding to determine whether [the court, acting reasonably,] could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In deciding whether the evidence supports the findings challenged in an appeal, we consider whether the inferences the trial court drew from the evidence are "reasonable and logical[.]" *In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012). And since the trial court, acting as a factfinder, may reasonably infer facts from proof of other facts if those inferences are also reasonable, we must assume "the factfinder resolved disputed facts in favor of its finding" for any findings it could reasonably infer from the facts proven in the trial. *In re J.F.C.*, 96 S.W.3d at 266.

Because we assume the trial court made all findings required that match its verdict, we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* Even though we disregard the evidence that a trial court could reasonably disbelieve, we do not disregard it when examining the record to see if it is sufficient to support the findings the trial court made when terminating a parent's rights. *Id.* Instead, when conducting a legal-

18

sufficiency review, we examine all the evidence and determine whether the record shows a reasonable factfinder could have terminated the parent's relationship with her child after considering the evidence that favors the trial court's findings and the evidence the factfinder could not have reasonably disregarded or ignored even though that evidence might have favored another ruling. *Id*.

Mother also argues the evidence is factually insufficient to support the trial court's judgment. In conducting a factual sufficiency review, we determine whether the evidence admitted at trial allowed a reasonable factfinder to form a firm belief or conviction that the facts the Department needed to prove to prevail are true. *Id.* In our review, we credit all evidence favoring the Department on the claims on which it prevailed at trial if the evidence that supports that claim is clear and convincing. *Id*. But we also consider any evidence admitted during the trial that is contrary to the factfinder's verdict to decide whether the factfinder, in the face of the conflicting evidence, could have resolved the dispute in the Department's favor. *Id*. If the factfinder could not have formed a firm belief or conviction that the Department's claims were true in light of all the evidence admitted in the trial, we will find the evidence insufficient to support the verdict, declare the verdict unsupported by clear and convincing evidence, and order a new trial. *Id*.

Besides challenging the predicate findings relevant to the subsection D and E grounds, the grounds the trial court relied on when terminating Mother's rights,

19

Mother argues the evidence is insufficient to support the trial court's best-interest finding. When reviewing a best-interest finding, we measure the evidence against the various factors listed in the Family Code and those discussed in *Holley*. Tex. Fam. Code Ann. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). If the evidence conflicts on the question about whether terminating the parent-child relationship is in the child's best interest, the factfinder may reasonably choose between the alternatives, and it may do so by weighing some evidence more heavily than it weighs other evidence in deciding what outcome will best serve the child's interests. *See In re A.P*., 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). Still, evidence relevant to predicate findings is often also relevant to the factfinder's best-interest finding, if the evidence on the predicate finding is clear and convincing. Tex. Fam. Code Ann. § 161.001(b)(1), (2).

### Issues One and Two - Sufficiency of the Evidence – The Condition Endangerment and Conduct Endangerment Findings

In issues one and two, Mother argues the evidence is legally and factually insufficient to support the trial court's findings of condition endangerment and conduct endangerment, the predicate grounds for terminating a parent-child relationship under subsections 161.001(b)(1)(D) and (E). Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). While similar, the subsections are not identical. Under subsection D, the Department had to prove, by clear and convincing evidence, that Mother knowingly placed or allowed Jordan to remain in conditions or surroundings

20

that endangered his physical or emotional well-being. *Id.* § 161.001(b)(1)(D). Under subsection E, the Department needed to prove, by clear and convincing evidence, that Mother knowingly placed Jordan with a person or allowed him to remain in a condition with a person who engaged in conduct that endangered Jordan's well-being. *Id.* § 161.001(b)(1)(E). Under either subsection D or E, the term endanger means "expose to loss or injury; to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021) (quoting "endanger," WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 599 (1976)). Generally, a parent's conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-being. *See In re J.O.A.,* 283 S.W.3d 336, 345 n.4 (Tex. 2009) (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Often, evidence used to establish violations of subsections D and E overlaps. Subsection D does not require evidence that a parent engaged in conduct multiple times, and evidence that a parent engaged in either acts or omissions that endangered a child, even a single act or omission may suffice. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Allegations involving subsection D violations require that courts examine the period before the Department removed the child from the home to evaluate the parent that placed or allowed the child to remain in a

21

condition that endangered the child's physical or emotional well-being. *Id*. (citing *In re L.C.,* 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). In contrast, allegations involving subsection E violations, may be "based on conduct both before and after removal." *In re A.L.H*., 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R*., 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

In cases involving claims to terminate a parent's rights to a child, domestic violence may be considered by the finder of fact as evidence that a parent has engaged in conduct or created a condition that endangers a child. *See In re K.P*., No. 09-13-00404-CV, 2014 WL 4105067 at *14, (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.); *In re C.J.O*., 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied). "'[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child.'" *In re Z.L.M*., No. 09-14-00457-CV, 2015 WL 474400, at *3 (Tex. App.—Beaumont Feb. 5, 2015, no pet.) (mem. op) (quoting *In re J.T.G*., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).

Here, the evidence elicited in the trial allowed the trial court, acting reasonably, to form a firm conviction or belief that Mother misused prescription drugs, was at times violent, had mental health issues, and demonstrated generally poor judgment and impulse control in relation to her Jordan.

22

**Prescription Drug Use**

Mother admitted to daily prescription drug use, appeared under the influence during visitations and at trial, and photographs were admitted at trial showing prescription drug bottles in plain view in her kitchen. Mother testified to having taken two prescription medications at trial, as well as some over-the-counter gummy medications for anxiety, medications that affected her ability to think and speak.[5] In previous interviews, Mother also admitted to having a prescription for Ambien. Her daughter told school personnel that Mother "gets drunk and falls down a lot," and often takes more than one whole Ambien pill. The evidence in the trial allowed the trial court to infer that Mother was abusing prescription drugs while around Jordan in her home, and that she frequently appeared to have slurred speech when visiting Jordan. The Caseworker and CASA both testified that Mother appeared to be under the influence at trial, as her demeanor was different than at previous interactions with Mother. *See In re R.W.*, 129 S.W.3d at 739 ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct."); *In re G.L.K*, No. 09-14-00283-CV, 2014 WL 6984414, at *6-7 (Tex. App.—Beaumont Dec. 11,

---

[5] In a Motion for New Trial hearing after the judgment of the trial court, Mother admitted to taking a drug, Klonopin, at the time of trial.

2014, no pet.) (mem. op.) (Determining a trial court could "reasonably conclude" that the parent's drug abuse, of some of which the child was aware, along with mental conduct, endangered their children); *In re T.D.L.*, No. 2-05-250-CV, 2006 WL 302126, *6 (Tex. App.—Fort Worth Feb. 9, 2006, no pet.) (mem. op.) (analyzing a parent's prescription drug use in relation to establishing an endangering course of conduct).

**Domestic Violence**

The evidence before the trial court, as the finder of fact, allowed it to infer that Jordan was exposed to incidents of domestic violence that occurred his presence in the home. *See In re L.E.S.*, 471 S.W.3d at 925 (citations omitted) ("[A]busive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional well-being of a child"); *In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *13 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) ("the fact that the children witness violence directed at another member of the household supports a finding of endangerment"). According to Mother, Jordan was assaulted by Father in one of these incidents and there were several others, which we already have already described, that Mother conceded in the trial occurred in Jordan's presence.

**Mental Health**

The trial court also heard testimony that Mother suffered from mental health issues, which required prescription medicine to control. Mother and Grandmother both testified that Mother continues to suffer from these mental health issues. Grandmother attributed Mother's problems to being a victim of domestic violence, an incident that required Mother's hospitalization where she was diagnosed with brain damage and has then noticed changes in Mother's personality. Additionally, the record contains emails that Mother sent to the Department. These emails, admitted into evidence during trial, contain rambling and sometimes incoherent claims alleging the Department was abusing Mother's children, and that the caseworker and Father were terrorists. Mother admitted she sent these emails but excused her behavior by explaining her "emotions were running high[.]" *See In re J.P.*-L., 592 S.W.3d 559, 583 n.26 (Tex. App.—Fort Worth 2019, pet. denied) ("A parent's mental health is frequently considered in reviewing the sufficiency of the evidence under endangerment grounds."); *Jordan v. Dossey*, 325 S.W.3d 700, 726 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (determining a fact finder could find Mother would "physically and emotionally endanger" her child because "any evidence of improvement was short lived and outweighed by the extent of her mental history over the course of most of her life…her minimization of her present mental condition, and her present failure to strictly comply with her medication and

therapy"); *In re H.H.*, No. 10-21-00040-CV, 2021 WL 2252707, at *2 (Tex. App.—

Waco May 27, 2021, pet. denied) (mem. op.) ("A parent's mental instability may

contribute to a finding that the parent engaged in a course of conduct that endangered

a child's physical or emotional well-being."); *In re R.W.*, 129 S.W.3d at 741 (a

factfinder is "not required to ignore a long history of dependency and destructive

behavior merely because it allegedly abated before trial").

**Poor Judgment and Impulsiveness**

Finally, evidence at trial demonstrated that Mother exhibited poor judgment

and impulsiveness with her older child, evidence the trial court was entitled to

consider in deciding whether Mother's lack of parenting skills and lack of judgment

created a condition that endangered Jordan as well. First, the Department caseworker

testified Mother left her eight-year-old daughter alone, in the dark, early one

morning at the child's school before the school personnel arrived. Even though

Mother's conduct did not directly involve Jordan, Mother's poor judgment and

endangerment to any of her children is relevant to a trial court's consideration in

deciding whether a parent created a condition that endangered a child. And although

when Mother's behavior when visiting with Jordan was generally satisfactory, she

displayed inappropriate behavior and judgment that ultimately led to the visits being

suspended. *See Tex. Dept. of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.

1987) ("Danger" may be inferred from parental misconduct, and "it is not necessary

that the conduct be directed at the child or that the child actually suffers injury"); *In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *10 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) ("The specific danger to the children's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the children and they suffer no actual injury."); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *18 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.) ("And a parent's endangering conduct toward one child may be considered to determine whether the parent engaged in behavior that endangered other children in the home."); *In re M.N.M.*, No. 11-11-00232-CV, 2012 WL 2370680, at *9 (Tex. App.—Eastland June 21, 2012, no pet.) (mem. op.) (A factfinder could determine that the parents endangered their children by exhibiting "poor judgment regarding the care and safety of the children, thereby creating dangers to their health and well-being").

From the record evidence as a whole, we conclude the trial court could have formed a firm belief or conviction that terminating Mother's parental rights to Jordan was proper under subsections D and E. *See In re J.F.C.*, 96 S.W.3d at 264-65. As the sole factfinder, the trial court could reasonably find that Mother's prescription drug use and misuse, ongoing mental health issues, history of domestic violence, and poor judgment, placed her child in circumstances that exposed the child to an unreasonable risk of harm to both his emotional and physical health. The trial court

27

also could have formed a firm belief or conviction that Mother, based on her conduct, continued to ignore the danger that her actions posed to Jordan, disregarding that danger based on her conduct, even though she was on notice the danger existed. *See In re S.R.,* 452 S.W.3d at 360 (subsections D and E both use the term endanger, which means "to expose a child to loss or injury or to jeopardize a child's emotional or physical health[ ]").We overrule Mother's first two issues.

## Issue Three -Sufficiency of the Evidence - Best Interest Finding

In her third issue, Mother contends the evidence is legally and factually insufficient to support the trial court's best-interest finding. Under the Family Code, there is a strong presumption that keeping a child with a parent is in the child's best interest. Tex. Fam. Code Ann. § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with its parent). Even so, it is also presumed "the prompt and permanent placement of the child in a safe environment is ... in the child's best interest." Tex. Fam. Code Ann. § 263.307(a). When determining whether terminating the parent-child relationship is in the child's best interest, we consider the non-exclusive factors identified by the Texas Supreme Court in *Holley v. Adams*.[6]

---

[6] In *Holley*, the Texas Supreme Court used these factors when reviewing the best-interest finding:
- the child's desires;
- the child's emotional and physical needs, now and in the future;
- the emotional and physical danger to the child, now and in the future;

In a best-interest analysis, courts focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs*., 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). Often, the evidence that supports the predicate findings on the D and E grounds may also support the trial court's best-interest finding. *In re T.R.S.,* No. 09-18-00482-CV, 2019 WL 2455273, at *5 (Tex. App.—Beaumont June 13, 2019, no pet.) (mem. op.) ("The same evidence that supports a trial court's findings under subsections D, E, … may also be relevant to the trial court's best-interest finding."). And the Department need not present evidence to support each of the *Holley* factors, as the lack of evidence on some factors will not preclude the factfinder from forming a strong conviction that terminating the parent-child relationship is in a child's best interest, particularly when the evidence is undisputed that the parent endangered the child. *In re C.H.,* 89 S.W.3d 17, 27 (Tex. 2002). As the reviewing court, the question we must decide is whether the record, when considered as a whole, supports the trial court's best-interest finding. *Id*. at 28.

---

- the parenting abilities of the parties seeking custody;
- the programs available to assist the party seeking custody;
- the plans for the child by the parties seeking custody;
- the stability of the home or the proposed placement;
- the parent's acts or omissions that reveal the existing parent-child relationship is improper; and
- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

Turning to the *Holley* factors, the evidence allowed the trial court to conclude that Mother did not provide her children with a stable home. The court heard testimony that Mother had long suffered from mental illness, problems that were ongoing and unresolved. In addition, the trial court heard testimony that Mother has been involved in various incidents involving domestic violence that occurred in Jordan's presence. And while there was testimony about Mother's home and that she lived in the same home for twenty years, the trial court also heard evidence that Mother was engaged and planned to move to another town with her fiancé after the marriage. Yet Mother presented the trial court with no evidence to show what that future home was like or whether it would be one that appropriate for children. The trial court also heard evidence that Mother displayed poor judgment that involved her children and impulsive behavior, minimizing her responsibility for her own actions.

Finally, the trial court heard testimony showing Mother suffered from longstanding mental health issues, was abusing prescription drugs, frequently appeared to be intoxicated or under the influence of drugs at visitations, and appeared under the influence of drugs during the trial. As the factfinder, the trial court could reasonably have inferred that Mother was abusing prescription medications and that her abuse of these medications explained to some extent why

she had poor judgment and showed she needed to be in treatment to resolve the mental health issues she acknowledged she had in the trial.

The trial court also heard testimony regarding Jordan's needs. For instance, there is testimony that show he is doing well in his foster placement, is receiving physical therapy, and is thriving. There is also evidence that Jordan is in adoptive placement that is in a safe, stable, and loving home. In contrast, Mother stated that she believed that Jordan had issues with his teeth and heart, without any evidence to support her claims. Mother denied that Jordan needed physical therapy. And Mother failed to present evidence showing what Jordan's living arrangement would be were she to leave her home and move to another town to live with her fiancé after she marries.

We recognize that a parent's rights to raise a child "are of constitutional magnitude," but a parent's rights as a parent are not absolute. *Id*. Mother simply has no right to put her interests above Jordan's and sacrifice his physical safety and emotional well-being to preserve the relationship she desires to have with him. Nothing at trial shows any change in Mother's past patterns of conduct, nor does the evidence provide any reassurance that these patterns would not recur.

We hold the trial court did not abuse its discretion by preferring an outcome that placed Jordan in a stable, safe, and permanent placement over the outcome Mother preferred. Deferring, as we must, to the trial court's role as the sole arbiter

31

of the facts, we hold the trial court could reasonably have formed a strong conviction that terminating the parent-child relationship is in the child's best interest. To prove what outcome is in a child's best interest, the Department need not produce evidence in the trial on each factor used to decide whether terminating the parent-child relationship is in the child's best interest. *See id.* at 27 ("But we have never held that these considerations are exhaustive, or that all such considerations must be proved as a condition precedent to parental termination."). We conclude the record contains legally and factually sufficient evidence to support the trial court's finding that terminating Mother's rights is in Jordan's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a); *see also J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. Because Mother's third issue lacks merit, it is overruled.

## Conclusion

Having overruled all of Mother's issues on appeal, we affirm the judgment of the trial court.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on April 18, 2022
Opinion Delivered July 5, 2022

Before Golemon, C.J., Kreger and Horton, JJ.

32